**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

Barcelona.com, Incorporated,

*Plaintiff-Appellant,*

v.

Excelentisimo Ayuntamiento de Barcelona,

*Defendant-Appellee.*

No. 02-1396

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-00-1412)

Argued: February 28, 2003

Decided: June 2, 2003

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

---

Reversed, vacated, and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Motz joined.

---

**COUNSEL**

**ARGUED:** Larry Zinn, San Antonio, Texas, for Appellant. Jordan Scot Weinstein, OBLON, SPIVAK, MCCLELLAND, MAIER & NEUSTADT, P.C., Arlington, Virginia, for Appellee. **ON BRIEF:** Jonathan Hudis, OBLON, SPIVAK, MCCLELLAND, MAIER & NEUSTADT, P.C., Arlington, Virginia, for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

Barcelona.com, Inc. ("Bcom, Inc."), a Delaware corporation, commenced this action under the Anticybersquatting Consumer Protection Act against Excelentisimo Ayuntamiento de Barcelona (the City Council of Barcelona, Spain) for a declaratory judgment that Bcom, Inc.'s registration and use of the domain name <barcelona.com> is not unlawful under the Lanham Act (Chapter 22 of Title 15 of the United States Code). The district court concluded that Bcom, Inc.'s use of <barcelona.com> was confusingly similar to Spanish trademarks owned by the City Council that include the word "Barcelona." Also finding bad faith on the basis that Bcom, Inc. had attempted to sell the <barcelona.com> domain name to the City Council for a profit, the court ordered the transfer of the domain name to the City Council.

Because the district court applied Spanish law rather than United States law and based its transfer order, in part, on a counterclaim that the City Council never filed, we reverse the judgment of the district court denying Bcom, Inc. relief under the Anticybersquatting Consumer Protection Act, vacate its memorandum opinion and its order to transfer the domain name <barcelona.com> to the City Council, and remand for further proceedings consistent with this opinion.

I

In 1996, Mr. Joan Nogueras Cobo ("Nogueras"), a Spanish citizen, registered the domain name <barcelona.com> in the name of his wife, also a Spanish citizen, with the domain registrar, Network Solutions, Inc., in Herndon, Virginia. In the application for registration of the domain name, Nogueras listed himself as the administrative contact. When Nogueras met Mr. Shahab Hanif, a British citizen, in June 1999, they developed a business plan to turn <barcelona.com> into a tourist portal for the Barcelona, Spain, region. A few months later they formed Bcom, Inc. under Delaware law to own <barcelona.com> and to run the website, and Nogueras, his wife, and Hanif became Bcom, Inc.'s officers. Bcom, Inc. was formed as an American company in part because Nogueras believed that doing so would facilitate

obtaining financing for the development of the website. Although Bcom, Inc. maintains a New York mailing address, it has no employees in the United States, does not own or lease office space in the United States, and does not have a telephone listing in the United States. Its computer server is in Spain.

Shortly after Nogueras registered the domain name <barcelona.com> in 1996, he placed some Barcelona-related information on the site. The site offered commercial services such as domain registry and web hosting, but did not offer much due to the lack of financing. Before developing the business plan with Hanif, Nogueras used a web-form on the City Council's official website to e-mail the mayor of Barcelona, Spain, proposing to "negotiate" with the City Council for its acquisition of the domain name <barcelona.com>, but Nogueras received no response. And even after the development of a business plan and after speaking with potential investors, Nogueras was unable to secure financing to develop the website.

In March 2000, about a year after Nogueras had e-mailed the Mayor, the City Council contacted Nogueras to learn more about Bcom, Inc. and its plans for the domain name <barcelona.com>. Nogueras and his marketing director met with City Council representatives, and after the meeting, sent them the business plan that was developed for Bcom, Inc.

On May 3, 2000, a lawyer for the City Council sent a letter to Nogueras demanding that Nogueras transfer the domain name <barcelona.com> to the City Council. The City Council owned about 150 trademarks issued in Spain, the majority of which included the word Barcelona, such as "Teatre Barcelona," "Barcelona Informacio I Grafic," and "Barcelona Informacio 010 El Tlefon Que Ho Contesta Tot." Its earlier effort in 1995 to register the domain name <barcelona.es>, however, was unsuccessful. The City Council's representative explained, "It was denied to Barcelona and to all place names in Spain." This representative also explained that the City Council did not try also to register <barcelona.com> in 1995 even though that domain name was available because "[a]t that time . . . the world Internet that we know now was just beginning and it was not seen as a priority by the City Council." The City Council now took the posi-

tion with Bcom, Inc. that its domain name <barcelona.com> was confusingly similar to numerous trademarks that the City Council owned.

A couple of days after the City Council sent its letter, Nogueras had the domain name <barcelona.com> transferred from his wife's name to Bcom, Inc., which he had neglected to do in 1999 when Bcom, Inc. was formed.

Upon Bcom, Inc.'s refusal to transfer <barcelona.com> to the City Council, the City Council invoked the Uniform Domain Name Dispute Resolution Policy ("UDRP") promulgated by the Internet Corporation for Assigned Names and Numbers ("ICANN") to resolve the dispute. Every domain name issued by Network Solutions, Inc. is issued under a contract, the terms of which include a provision requiring resolution of disputes through the UDRP. In accordance with that policy, the City Council filed an administrative complaint with the World Intellectual Property Organization ("WIPO"), an ICANN-authorized dispute-resolution provider located in Switzerland. The complaint sought transfer of the domain name <barcelona.com> to the City Council and relied on Spanish law in asserting that Bcom, Inc. had no rights to the domain name while the City Council had numerous Spanish trademarks that contained the word "Barcelona." As part of its complaint, the City Council agreed "to be subject to the jurisdiction of the registrant[']s residence, the Courts of Virginia (United States), only with respect to any challenge that may be made by the Respondent to a decision by the Administrative Panel to transfer or cancel the domain names that are [the] subject of this complaint."

The administrative complaint was resolved by a single WIPO panelist who issued a ruling in favor of the City Council on August 4, 2000. The WIPO panelist concluded that <barcelona.com> was confusingly similar to the City Council's Spanish trademarks, that Bcom, Inc. had no legitimate interest in <barcelona.com>, and that Bcom, Inc.'s registration and use of <barcelona.com> was in bad faith. To support his conclusion that Bcom, Inc. acted in bad faith, the WIPO panelist observed that the only purpose of the business plan was "to commercially exploit information about the City of Barcelona . . . particularly . . . the information prepared and provided by [the City Council] as part of its public service." The WIPO panelist ordered

that Bcom, Inc. transfer the domain name <barcelona.com> to the City Council.

In accordance with the UDRP's provision that required a party aggrieved by the dispute resolution process to file any court challenge within ten business days, Bcom, Inc. commenced this action on August 18, 2000 under the provision of the Anticybersquatting Consumer Protection Act (the "ACPA") that authorizes a domain name owner to seek recovery or restoration of its domain name when a trademark owner has overstepped its authority in causing the domain name to be suspended, disabled, or transferred. *See* 15 U.S.C. § 1114(2)(D)(v). Bcom, Inc.'s complaint sought a declaratory judgment that its use of the name <barcelona.com> "does not infringe upon any trademark of defendant or cause confusion as to the origin, sponsorship, or approval of the website <barcelona.com>; . . . [and] that [the City Council] is barred from instituting any action against [Bcom, Inc.] for trademark infringement." While the City Council answered the complaint and stated, as an affirmative defense, that the court lacked jurisdiction over the City Council for any cause of action other than Bcom, Inc.'s "challenge to the arbitrator's Order issued in the UDRP domain name arbitration proceeding," the City Council filed no counterclaim to assert any trademark rights.

Following a bench trial, the district court entered a memorandum opinion and an order dated February 22, 2002, denying Bcom, Inc.'s request for declaratory judgment and directing Bcom, Inc. to "transfer the domain name barcelona.com to the [City Council] forthwith." 189 F. Supp. 2d 367, 377 (E.D. Va. 2002). Although the district court concluded that the WIPO panel ruling "should be given no weight and this case must be decided based on the evidence presented before the Court," the court proceeded in essence to apply the WIPO panelist opinion as well as Spanish law. *Id.* at 371. The court explained that even though the City Council did not own a trademark in the name "Barcelona" alone, it owned numerous Spanish trademarks that included the word Barcelona, which could, under Spanish law as understood by the district court, be enforced against an infringing use such as <barcelona.com>. *Id.* Adopting the WIPO panelist's decision, the court stated that "the WIPO decision was correct in its determination that [Bcom, Inc.] took 'advantage of the normal confusion' of an Internet user by using the 'Barcelona route' because an Internet user

would 'normally expect to reach some official body . . . for . . . the information.'" *Id.* at 372. Referring to the facts that Bcom, Inc. engaged in little activity and attempted to sell the domain name to the City Council, the court concluded that "these factors clearly demonstrate a bad faith intent on the part of the Plaintiff and its sole shareholders to improperly profit from their registration of the domain name barcelona.com." At bottom, the court concluded that Bcom, Inc. failed to demonstrate, as required by 15 U.S.C. § 1114(2)(D)(v), that its use of <barcelona.com> was "not unlawful." *Id.* at 373.

In addition to concluding that Bcom, Inc. failed to establish its claim, the court stated that it was also deciding the City Council's counterclaim for relief under 15 U.S.C. § 1125 and determined that "the Spanish trademark 'Barcelona' is valid for purposes of the ACPA." *Id.* at 374. Applying the factors of 15 U.S.C. § 1125(2)(d)(1)(B)(i), the court found that Nogueras and his wife acted with "bad faith intent" in registering <barcelona.com> as a domain name. *Id.* at 374-76. The court also found that <barcelona.com> "is confusingly similar to the defendant's mark." *Id.* at 376.

From the district court's order of February 22, 2002, Bcom, Inc. filed this appeal.

## II

Bcom, Inc. contends that when it "sought a declaration under 15 U.S.C. § 1114(2)(D)(v), it was entitled to have its conduct judged by U.S. trademark law, not Spanish trademark law." It argues that even if Spanish law applies, however, a party cannot, under Spanish law, "get a registration for a term that is only geographically descriptive, such as the word 'Barcelona.'" Finally, it maintains that its use of the domain name was not unlawful under United States trademark law because it could not be found to have acted in bad faith under § 1125, as the district court concluded.

The City Council contends that the WIPO panelist's decision, including its reference to Spanish law, must be considered to decide this case. It argues:

[T]rial courts may consider rights in foreign trademarks which were asserted in the transfer decision under review. The [WIPO] administrative transfer proceeding itself gives the district court both subject matter and personal jurisdiction; jurisdiction is not dependent upon allegations of U.S. trademark rights. Therefore, failure to consider the basis for the administrative decision would remove the basis for jurisdiction, and require dismissal of the case. The statute language does not limit the marks considered to U.S. marks.

* * *

To hold otherwise would be to strip a trademark owner of its foreign rights whenever it is haled into court by a U.S. domain name owner who has lost a UDRP administrative proceeding. Without the ability to assert their rights, foreign trademark owners would automatically lose such proceedings, creating an unintended and unjust result.

The City Council also maintains that the district court's conclusions of confusing similarity and bad faith were factually supported and justified.

In light of the City Council's argument that "failure to consider the basis for the [WIPO] decision would remove the basis for [this court's] jurisdiction," we will review first the basis for our jurisdiction and the role of the WIPO panelist's administrative decision.

Bcom, Inc.'s complaint, brought in the Eastern District of Virginia where the domain name <barcelona.com> was registered with Network Solutions, Inc., originally asserted three claims in three separate counts: a claim for declaratory judgment and injunctive relief under 15 U.S.C. § 1114(2)(D)(v); a claim for fraud and unfair competition; and a claim for tortious interference with prospective economic advantage. In response to the City Council's motion to dismiss on various jurisdictional grounds, Bcom, Inc. voluntarily dismissed all claims except its claim under § 1114(2)(D)(v). After the district court denied the City Council's motion to dismiss, the City Council filed an answer, stating as one of its affirmative defenses:

> This court lacks jurisdiction over Defendant regarding any cause of action other than Plaintiff's challenge to the arbitrator's Order issued in the UDRP domain name arbitration proceeding.

This statement reflects the City Council's stipulation that when it filed the WIPO administrative claim in Switzerland, "the City Council agreed to be subject to the jurisdiction of 'the Courts of Virginia (United States), only with respect to any challenge that may be made by the Respondent to a decision by the Administrative Panel to transfer or cancel the domain names that are [the] subject of this complaint.'" Accordingly, at least with respect to a claim brought under § 1114(2)(D)(v), the City Council agrees that the district court had personal jurisdiction over the City Council.

The district court had subject matter jurisdiction based on the fact that this case was brought under the Lanham Act, as amended by the ACPA, and that §§ 1331 and 1338 of Title 28 confer jurisdiction over such claims.

Apparently, the City Council does not dispute these jurisdictional observations as far as they go. It contends, however, that jurisdiction to hear a claim under § 1114(2)(D)(v) rests on a recognition of the WIPO proceeding and the law that the WIPO panelist applied. Although we agree with the City Council that the WIPO proceeding is relevant to a claim under § 1114(2)(D)(v), it is not jurisdictional; indeed, the WIPO panelist's decision is not even entitled to deference on the merits. A brief review of the scheme established by ICANN in adopting the UDRP and by Congress in enacting the ACPA informs our resolution of this issue.

A domain name is "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." 15 U.S.C. § 1127. To obtain a domain name, a would-be registrant simply makes application to a registrar (there are currently over 160), submits a fee, and agrees to the terms of the domain name registration agreement. Domain names are assigned on a first-come, first-served basis.

The agreement that accompanies the registration of a domain name specifies terms and conditions of the registration and the policies governing the registrant's continued control over the domain name, including conditions for suspension or transfer of the domain name.

It also provides a contractually mandated process, the UDRP, for resolution of disputes that might arise between domain name registrants and trademark owners. The UDRP is intended to provide a quick process for resolving domain name disputes by submitting them to authorized panels or panel members operating under rules of procedure established by ICANN and under "any rules and principles of law that [the panel] deems applicable." ICANN, Rules for Uniform Domain Name Dispute Resolution Policy, ¶ 15(a), *at* http:// www.icann.org/dndr/udrp/uniform-rules.htm (Oct. 24, 1999).

Because the administrative process prescribed by the UDRP is "adjudication lite" as a result of its streamlined nature and its loose rules regarding applicable law, the UDRP itself contemplates judicial intervention, which can occur before, during, or after the UDRP's dispute-resolution process is invoked. *See* ICANN, UDRP ¶ 3(b), at http:// www.icann.org/dndr/udrp/policy.htm (Oct. 24, 1999) (stating that the registrar will cancel or transfer the domain name upon the registrar's "receipt of an order from a court or arbitral tribunal, in each case of competent jurisdiction, requiring such action"); *id.* at ¶ 4(k) ("The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding is concluded"); *id.* (providing that the registrar will stay implementation of the administrative panel's decision if the registrant commences "a lawsuit against the complainant in a jurisdiction to which the complainant has submitted" under the applicable UDRP rule of procedure). As ICANN recognized in designing the UDRP, allowing recourse to full-blown adjudication under a particular nation's law is necessary to prevent abuse of the UDRP process. *See id.* at ¶ 1 (defining "reverse domain name hijacking" as use of the UDRP "in bad faith to attempt to deprive a registered domain-name holder of a domain name"). Thus, when a person obtains a domain name, the person agrees, in the registration contract with the registrar, to follow the UDRP as established by ICANN.

In 1999, Congress amended the Trademark Act of 1946 (the Lanham Act) with the Anticybersquatting Consumer Protection Act (ACPA), Pub. L. No. 106-113, § 3001 *et seq.*, 113 Stat. 1501A-545 (codified in scattered sections of 15 U.S.C.), principally for the purpose of protecting trademark owners against cyberpiracy:

> The purpose of the bill is to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks — a practice commonly referred to as "cybersquatting."

S. Rep. No. 106-140, at 4 (1999). Although the ACPA was enacted primarily to redress cyberpiracy or "cybersquatting," it also provides limited liability for trademark infringement by registrars who participate in the administration of the registration, transfer, and cancellation of domain names pursuant to a "reasonable policy" that is consistent with the purposes of the trademark laws. *See* 15 U.S.C. § 1114(2)(D)(i)-(iii). And to balance the rights given to trademark owners against cybersquatters, the ACPA also provides some protection to domain name registrants against "overreaching trademark owners." S. Rep. No. 106-140, at 11; *see also* 15 U.S.C. § 1114(2)(D)(iv)-(v). Thus, § 1114(2)(D)(v) authorizes a domain name registrant to sue trademark owners for "reverse domain name hijacking."[1] Under that reverse domain name hijacking provision, a domain name registrant who is aggrieved by an overreaching trademark owner may commence an action to declare that the domain name registration or use by the registrant is not unlawful under the Lanham Act. This section provides that the court may "grant injunc-

---

[1]If a domain-name registrant cybersquats in violation of the ACPA, he "hijacks" the domain name from a trademark owner who ordinarily would be expected to have the right to use the domain name involving his trademark. But when a trademark owner overreaches in exercising rights under the ACPA, he "reverse hijacks" the domain name from the domain-name registrant. Thus, § 1114(2)(D)(v), enacted to protect domain-name registrants against overreaching trademark owners, may be referred to as the "reverse domain name hijacking" provision.

tive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant." 15 U.S.C. § 1114(2)(D)(v).

In sum, domain names are issued pursuant to contractual arrangements under which the registrant agrees to a dispute resolution process, the UDRP, which is designed to resolve a large number of disputes involving domain names, but this process is not intended to interfere with or modify any "independent resolution" by a court of competent jurisdiction. Moreover, the UDRP makes no effort at unifying the law of trademarks among the nations served by the Internet. Rather, it forms part of a contractual policy developed by ICANN for use by registrars in administering the issuance and transfer of domain names. Indeed, it explicitly anticipates that judicial proceedings will continue under various nations' laws applicable to the parties.

The ACPA recognizes the UDRP only insofar as it constitutes a part of a policy followed by registrars in administering domain names, and the UDRP is relevant to actions brought under the ACPA in two contexts. First, the ACPA limits the liability of a registrar in respect to registering, transferring, disabling, or cancelling a domain name if it is done in the "implementation of *a reasonable policy*" (including the UDRP) that prohibits registration of a domain name "identical to, confusingly similar to, or dilutive of another's mark." 15 U.S.C. § 1114(2)(D)(ii)(II) (emphasis added). Second, the ACPA authorizes a suit by a domain name registrant whose domain name has been suspended, disabled or transferred *under that reasonable policy* (including the UDRP) to seek a declaration that the registrant's registration and use of the domain name involves no violation of the Lanham Act as well as an injunction returning the domain name.

Thus, while a decision by an ICANN-recognized panel might be a condition of, indeed the reason for, bringing an action under 15 U.S.C. § 1114(2)(D)(v), its recognition *vel non* is not jurisdictional. Jurisdiction to hear trademark matters is conferred on federal courts by 28 U.S.C. §§ 1331 and 1338, and a claim brought under the ACPA, which amended the Lanham Act, is a trademark matter over which federal courts have subject matter jurisdiction.

Moreover, any decision made by a panel under the UDRP is no more than an agreed-upon administration that is *not* given any defer-

ence under the ACPA. To the contrary, because a UDRP decision is susceptible of being grounded on principles foreign or hostile to American law, the ACPA authorizes reversing a panel decision if such a result is called for by application of the Lanham Act.

In sum, we conclude that we have jurisdiction over this dispute brought under the ACPA and the Lanham Act. Moreover, we give the decision of the WIPO panelist no deference in deciding this action under § 1114(2)(D)(v). *See Dluhos v. Strasberg*, 321 F.3d 365, 373-74 (3d Cir. 2003) (holding that 15 U.S.C. § 1114(2)(D)(v) requires the federal court to approach the issues raised in an action brought under that provision *de novo* rather than to apply the deferential review appropriate to actions governed by the Federal Arbitration Act); *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 28 (1st Cir. 2001) (explaining that "a federal court's interpretation of the ACPA supplants a WIPO panel's interpretation of the UDRP"). Thus, for our purposes, the WIPO panelist's decision is relevant only to serve as the reason for Bcom, Inc.'s bringing an action under § 1114(2)(D)(v) to reverse the WIPO panelist's decision.

## III

Now we turn to the principal issue raised in this appeal. Bcom, Inc. contends that in deciding its claim under § 1114(2)(D)(v), the district court erred in applying the law of Spain rather than the law of the United States. Because the ACPA explicitly requires application of the Lanham Act, not foreign law, we agree.

Section 1114(2)(D)(v), the reverse domain name hijacking provision, states:

> A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(v). Thus, to establish a right to relief against an "overreaching trademark owner" under this reverse hijacking provision, a plaintiff must establish (1) that it is a domain name registrant; (2) that its domain name was suspended, disabled, or transferred under a policy implemented by a registrar as described in 15 U.S.C. § 1114(2)(D)(ii)(II); (3) that the owner of the mark that prompted the domain name to be suspended, disabled, or transferred has notice of the action by service or otherwise; and (4) that the plaintiff's registration or use of the domain name is not unlawful under the Lanham Act, as amended.

The parties do not dispute that the first two elements are satisfied. Bcom, Inc. is a domain name registrant, and its domain name was suspended, disabled, or transferred under Network Solutions' policy, i.e., the UDRP incorporated into the domain name registration agreement for <barcelona.com>. Although the domain name had not actually been transferred from Bcom, Inc. as of the time that Bcom, Inc. commenced this action, the WIPO panelist had already ordered the transfer, and as a result of this order the transfer was certain to occur absent the filing of this action to stop it. By filing this suit, Bcom, Inc. obtained an automatic stay of the transfer order by virtue of paragraph 4(k) of the UDRP, which provides that the registrar will stay implementation of the administrative panel's decision if the registrant commences "a lawsuit against the complainant in a jurisdiction to which the complainant has submitted" under the applicable UDRP rule of procedure. *See* ICANN, UDRP ¶ 4(k). Moreover, this suit for declaratory judgment and injunctive relief under § 1114(2)(D)(v) appears to be precisely the mechanism designed by Congress to empower a party whose domain name is subject to a transfer order like the one in the present case to prevent the order from being implemented. *See Sallen*, 273 F.3d at 25 n.11 ("We think that § 1114(2)(D)(ii)(II), the statutory provision referenced in § 1114(2)(D)(v), covers situations where a transfer by [the registrar] is inevitable unless a court action is filed").

There also can be no dispute that Bcom, Inc. provided notice of this § 1114(2)(D)(v) action to the City Council.

It is the last element that raises the principal issue on appeal. Bcom, Inc. argues that the district court erred in deciding whether Bcom, Inc.

satisfied this element by applying Spanish law and then by concluding that Bcom, Inc.'s use of the domain name violated Spanish law.

It appears from the district court's memorandum opinion that it indeed did resolve the last element by applying Spanish law. Although the district court recognized that the City Council did not have a registered trademark in the name "Barcelona" alone, either in Spain or in the United States, it observed that "[u]nder Spanish law, when trademarks consisting of two or more words contain one word that stands out in a predominant manner, that dominant word must be given decisive relevance." *Barcelona.com, Inc.*, 189 F. Supp. 2d at 371-72. The court noted that "the term 'Barcelona' has been included in many trademarks consisting of two or more words owned by the City Council of Barcelona. In most of these marks, the word 'Barcelona' is clearly the dominant word which characterizes the mark." *Id.* at 372. These observations regarding the substance and effect of Spanish law led the court to conclude that the City Council of Barcelona "owns a legally valid Spanish trademark for the dominant word 'Barcelona.'" *Id.* The district court then proceeded to determine whether Bcom's "use of the Barcelona trademark is 'not unlawful.'" *Id.* In this portion of its analysis, the district court determined that there was a "confusing similarity between the barcelona.com domain name and the marks held by the Council," *id.*, and that "the circumstances surrounding the incorporation of [Bcom, Inc.] and the actions taken by Nogueras in attempting to sell the domain name evidence[d] a bad faith intent to profit from the registration of a domain name containing the Council's mark," *id.* Applying Spanish trademark law in this manner, the court resolved that Bcom, Inc.'s registration and use of <barcelona.com> were unlawful.

It requires little discussion to demonstrate that this use of Spanish law by the district court was erroneous under the plain terms of the statute. The text of the ACPA explicitly requires application of the Lanham Act, not foreign law, to resolve an action brought under 15 U.S.C. § 1114(2)(D)(v). Specifically, it authorizes an aggrieved domain name registrant to "file a civil action to establish that the registration or use of the domain name by such registrant is *not unlawful under this chapter*." 15 U.S.C. § 1114(2)(D)(v) (emphasis added).[2] It

---

[2]The ACPA actually provides that the registrant may sue to declare that the domain name's use by such registrant is "not unlawful under this

is thus readily apparent that the cause of action created by Congress in this portion of the ACPA requires the court adjudicating such an action to determine whether the registration or use of the domain name violates the Lanham Act. Because the statutory language has a plain and unambiguous meaning that is consistent with the statutory context and application of this language in accordance with its plain meaning provides a component of a coherent statutory scheme, our statutory analysis need proceed no further. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent" (quotation marks omitted)).

By requiring application of United States trademark law to this action brought in a United States court by a United States corporation involving a domain name administered by a United States registrar, 15 U.S.C. § 1114(2)(D)(v) is consistent with the fundamental doctrine of territoriality upon which our trademark law is presently based. Both the United States and Spain have long adhered to the Paris Convention for the Protection of Industrial Property. *See* Convention for the Protection of Industrial Property of 1883 (the "Paris Convention"), *opened for signature* Mar. 20, 1883, 25 Stat. 1372, as amended at Stockholm, *opened for signature* July 14, 1967, 21 U.S.T. 1583. Section 44 of the Lanham Act, 15 U.S.C. § 1126, incorporates the Paris Convention into United States law, but only "to provide foreign nationals with rights under United States law which are coextensive with the substantive provisions of the treaty involved." *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 597 (4th Cir. 1992); *see also Int'l Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) ("[T]he rights articulated in the Paris Convention do not exceed the rights conferred by the Lanham Act"). The relevant substantive provision in this case is Article 6(3)

---

Act." 113 Stat. 1501A-550, § 3004. "Act" is defined to refer to the Trademark Act of 1946 (the Lanham Act). *Id.* Upon codification, the term "this Act" became "this chapter," Chapter 22 of Title 15, which contains the Lanham Act.

of the Paris Convention, which implements the doctrine of territoriality by providing that "[a] mark duly registered in a country of the [Paris] Union shall be regarded as independent of marks registered in the other countries of the Union, including the country of origin." Paris Convention, *supra*, art. 6(3). As one distinguished commentary explains, "the Paris Convention creates nothing that even remotely resembles a 'world mark' or an 'international registration.' Rather, it recognizes the principle of the territoriality of trademarks [in the sense that] a mark exists only under the laws of each sovereign nation." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29:25 (4th ed. 2002).

It follows from incorporation of the doctrine of territoriality into United States law through Section 44 of the Lanham Act that United States courts do not entertain actions seeking to enforce trademark rights that exist only under foreign law. *See Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990) ("The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme"). Yet the district court's application of foreign law in this declaratory judgment action did precisely this and thereby neglected to apply United States law as required by the statute.

When we apply the Lanham Act, not Spanish law, in determining whether Bcom, Inc.'s registration and use of <barcelona.com> is unlawful, the ineluctable conclusion follows that Bcom, Inc.'s registration and use of the name "Barcelona" is not unlawful. Under the Lanham Act, and apparently even under Spanish law, the City Council could not obtain a trademark interest in a purely descriptive geographical designation that refers only to the City of Barcelona. *See* 15 U.S.C. § 1052(e)(2); *see also* Spanish Trademark Law of 1988, Art. 11(1)(c) (forbidding registration of marks consisting exclusively of "geographical origin"). Under United States trademark law, a geographic designation can obtain trademark protection if that designation acquires secondary meaning. *See, e.g., Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 421 (4th Cir. 1998). On the record in this case, however, there was no evidence that the public — in the United States or elsewhere — associates "Barcelona" with anything other than the City itself. Indeed, the Chief Director of the City Council submitted an affidavit stating that "[t]he City does not own

and is not using any trademarks in the United States, to identify any goods or services." Therefore, under United States trademark law, "Barcelona" should have been treated as a purely descriptive geographical term entitled to no trademark protection. *See* 15 U.S.C. § 1052(e)(2). It follows then that there was nothing unlawful about Nogueras' registration of <barcelona.com>, nor is there anything unlawful under United States trademark law about Bcom, Inc.'s continued use of that domain name.[3]

For these reasons, we conclude that Bcom, Inc. established entitlement to relief under 15 U.S.C. § 1114(2)(D)(v) with respect to the domain name <barcelona.com>, and accordingly we reverse the district court's ruling in this regard.

IV

After applying Spanish trademark law to deny Bcom, Inc. relief under 15 U.S.C. § 1114(2)(D)(v), the district court also proceeded to adjudicate what it described as the City Council's "counterclaim for relief under the [ACPA]." *Barcelona.com, Inc.*, 189 F. Supp. 2d at 373 (referring to 15 U.S.C. § 1125(d)(1)(A)). The court devoted approximately half of its opinion to issues arising out of this alleged counterclaim and, in this section of its opinion, issued rulings (1) that claims may be brought under 15 U.S.C. § 1125(d) premised on the violation of foreign marks because the statute's coverage is not limited to violations of United States trademarks, *id.* at 373-74, (2) that Bcom acted with a bad faith intent to profit under the nine nonexclusive factors set forth in 15 U.S.C. § 1125(d)(1)(B), *id.* at 374-76, and (3) that <barcelona.com> was "confusingly similar" to the City Council's Spanish trademarks which "contain the term 'Barcelona' as the dominant element," *id.* at 376.

We do not reach the merits of Bcom Inc.'s appeal of the district court's rulings on these issues insofar as they relate to the "counterclaim" under § 1125 because the City Council never filed a counterclaim. The issues presented by the district court's rulings on this

---

[3]Bcom, Inc. asserts that of the 100 most populous cities in the world, it could discover only one — Sydney, Australia — whose name, sydney.com, was registered to the city.

"counterclaim" are not before us on appeal because they were not properly before the district court *ab initio*.[4] Accordingly, we vacate the district court's rulings on all issues arising out of this phantom counterclaim.

V

For the foregoing reasons, we reverse the district court's ruling that denied Bcom, Inc. relief under 15 U.S.C. § 1114(2)(D)(v); we vacate its Memorandum Opinion and Order of February 22, 2002; and we remand for further proceedings to determine and grant the appropriate relief under § 1114(2)(D)(v).

*REVERSED, VACATED, AND REMANDED*

[4]Counsel for the parties agreed at oral argument that no counterclaim had been filed. We can only speculate that the district court's mistaken attribution of a counterclaim to the City Council may perhaps have rested on statements relating to the § 1125 "bad faith" factors in the City Council's Proposed Findings of Fact and Conclusions of Law.