**Jeff DAVIES, Plaintiff,**

v.

**AFILIAS LIMITED, Defendant.**

**No. 6:03–CV–301–ORL–31JGG.**

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 2, 2003.

**1266**

Jeff Davies, Orlando, FL, pro se.

Jose I. Rojas, Concepcion Rojas & Santos LLP, Coral Gables, FL, for defendant/counter-claimant.

## ORDER

PRESNELL, District Judge.

This cause comes for the Court's consideration on Defendant's Motion for Partial Summary Judgment (Doc. 26) and Plaintiff's Response thereto (Doc. 31). The Court heard oral argument on November 10, 2003.

## I. Background

The Court laid out most of the facts pertinent to this case in its Order of July 1, 2003 (Doc. 22) denying Plaintiff's Motion for Summary Judgment. The Court reiterates the following relevant facts and sets forth additional facts below.

Defendant entered into an agreement with the Internet Corporation for Assigned Names and Numbers ("ICANN") ("ICANN–Afilias Agreement")[1] whereby Defendant agreed to serve as the registry operator for the new ".info" top-level domain ("TLD"). The Agreement incorporated by reference several appendices, all of which were available to the public on ICANN's Web site, www.icann.org. One of the appendices—Appendix J[2]—set forth the "Registration Start–Up Plan," i.e., the multi-step process by which Defendant planned to implement the registration system for all .info domain names. The Start–Up Plan described two periods—a "Sunrise Period" and a "Land Rush Period." During each Period, Defendant envisioned use of a "logical queue system" under which registrants and registrars could submit and process registrations of domain names. Under this queue system, an individual registrant would input his registration request information into a registrar's system, and then the various authorized registrars would submit those registrations to individual queue databases managed by Defendant. Thereafter, the registry randomly queues the order of requests, and domain names are appropriated on a round-robin basis.

During the Sunrise Period,[3] which took place "prior to opening the Registry for general registration, ... owners of any current (non-expired) trademark or service

---

**1.** The ICANN Afilias Agreement, dated May 11, 2001, was filed as Exhibit A to Defendant's Notice of Filing Exhibits in Support of its Motion for Summary Judgment. (Doc. 27).

**2.** Appendix J was filed as Exhibit B to Document 27. The Appendix also was filed as Attachment 1 to the Declaration of Michael D. Palage ("Palage Decl."), which is set forth as Exhibit 1 to Defendant's Motion for Partial Summary Judgment. (Doc. 26). Michael Palage serves as one of Defendant's consultants.

**3.** This Period is variously referred to as *inter alia* the Sunrise Period, Sunrise Challenge Process, Challenge Process, Sunrise Registration Policy, and Sunrise Process. For simplicity's sake, the Court will, where possible, refer to the period during which a trademark owner could challenge and/or register a domain name as "the Sunrise Period" or "the Sunrise Process."

mark registration having national effect ... will be eligible to register a domain name that is identical to the textual or word elements of such trademark or service mark...." (Appendix J at ¶ 3).

Moreover, during the Sunrise Period, any person or entity—even a person who did not own any trademarks or service marks—could challenge a domain name that had been allegedly registered improperly, i.e., by a party who did not own the qualifying trademark. (Original Sunrise Challenge Rules at ¶ 3(a)).[4] At that point, a successful challenger had two options. Under Option 1, the successful challenger could request cancellation of the domain name. Under Option 2, the successful challenger could request transfer of the domain name. Under the original Sunrise rules for Option 2, a successful challenger would be issued an authorization code with which to register the domain name,[5] and neither the registry nor the registrar would verify that the successful challenger possessed the necessary trademark. Later, however, in reaction to registrants attempting to "circumvent the eligibility requirements by posing as trademark holders and registering names in advance of the public opening ..." (Press Release by Afilias of August 15, 2001),[6] Defendant amended the process so Defendant itself could challenge registrations using the Sunrise Rules and so it was clear that in order for a challenger to receive the right to register a trademarked domain name, the challenger had to provide evidence of trademark ownership.

Whereas the Sunrise Process[7] envisioned an early registration period for trademark and service mark owners, the Land Rush Process by contrast did "not impose any restrictions on who may register a domain name ... other than those restrictions that apply during the normal operation of the Registry." (Appendix J at ¶ 4). The Land Rush Process was scheduled to begin "immediately after the conclusion of the Sunrise Period and any Cooling Off portion of the Sunrise Period." (*Id.; see also id.* at ¶ 8). At that time, Defendant agreed to make a general public announcement of the Land Rush start date and thereafter commence the "logical queue system" for equitable allocation of domain names.

On September 23, 2001, during the Sunrise Process, Plaintiff filed more than 30 challenges[8] to various domain names—including for example hotel.info—on the basis that the names had been improperly registered by others who did not own

---

4. The original Sunrise Challenge Rules were filed as Exhibit D to Document 27. In addition, they were filed as Attachment 2 to the Palage Declaration. The Original Sunrise Challenge Policy is included in the record as Attachment 3 to the Palage Declaration, and also was filed as Exhibit E to Document 27.

5. This Sunrise Period rule reads in relevant part:

If a prevailing Challenger seeks the transfer of a domain name subject to the dispute, as stipulated in Paragraph 4(j) of the Policy, such Challenger shall be provided with an authorization code generated by the Registry which will allow the Challenger to register the Domain Name in its name in accordance

with the sunrise registration conditions of the Registration Agreement.
(Original Sunrise Challenge Rules, at ¶ 11(b)).

6. This Press Release, entitled "Afilias to Challenge Questionable Sunrise Registrations in .INFO," was filed as Exhibit C to Document 27.

7. Defendant subcontracted the World Intellectual Property Organization ("WIPO")—the international organization charged with administering intellectual property treaties—to administer this process in accordance with the ICANN–Afilias Agreement.

8. Plaintiff originally filed 35 challenges but proceeded with only 32 of them.

trademarks for those names. These initial challenges are not in question. The next day, WIPO responded to Plaintiff's challenges with an e-mail [9] informing him of Sunrise Challenge Policy [10] ¶ 4(j), which states:

> In cases where a prevailing Challenger seeks the transfer of the Domain Name, such Challenger will be provided with an authorization code generated by the Registry which will allow the Challenger to register the Domain Name in its name, at the registrar of its choice, within 10 days of the date on which the notification of the authorization code is sent to the Challenger, in accordance with and subject to the sunrise registration conditions set forth in the Registration Agreement.

(Original Sunrise Challenge Policy at ¶ 4(j)).

On November 26, 2001, because the party that had improperly registered hotel.info failed to respond to Plaintiff's challenge, WIPO issued a default administrative order to Plaintiff. (WIPO Notification).[11] Although Plaintiff admitted that he did not own trademark rights to any of the domain names he challenged,[12] WIPO ordered the transfer of hotel.info to Plaintiff. WIPO agreed to send, by separate communication, an authorization code to enable Plaintiff to register hotel.info with an authorized registrar "in accordance with the sunrise registration conditions of the Registration Agreement." (Id.). At that time, there was no procedure to confirm that Plaintiff (or any other registrant) actually possessed a qualifying trademark, but WIPO reminded Plaintiff that he, as a "Priority Challenger must hold a trademark or service mark registration that meets the criteria set forth in paragraph 4(b) of the Sunrise Registration Challenge Policy." (Id.).

Upon receipt of the authorization code, Plaintiff registered hotel.info with DirectNIC [13] his Afilias-authorized registrar of choice. (Vinterella Decl. at ¶ 6). At some point thereafter, Defendant determined that Plaintiff did not own trademark rights to the names that he had registered under the Sunrise Period and thus "locked" the names to prevent Plaintiff's use of them.

Defendant now moves for partial summary judgment as to: 1) Plaintiff's claim of tortious interference with his contract with DirectNIC; 2) Plaintiff's claim of a violation of the Anticybersquatting Consumer Protection Act,[14] and 3) Defendant's counterclaim for violations of the Computer Fraud and Abuse Act.

---

9. This e-mail was filed as Attachment 4 to the Palage Declaration. WIPO sent a second e-mail to Plaintiff on September 25, 2001, reiterating the application of the Sunrise rules to any challenger requesting transfer of a domain name. (Palage Decl., Attach. 5).

10. This Original Sunrise Challenge Policy was filed as Attachment 3 to the Palage Declaration.

11. This default order and Notification was filed as Attachment 7 to the Palage Declaration.

12. There seems to be no dispute that the domain names at issue are generic, i.e., not subject to trademark rights or protection.

13. Plaintiff's contract with DirectNIC was filed as Attachment 2 to the Declaration of David Vinterella, in-house counsel for Intercosmos Media Group, Inc., d/b/a DirectNIC. The Vinterella Declaration was filed as Exhibit 2 to Document 26.

14. Defendant also moves for summary judgment on its affirmative defenses of unclean hands and breach of the domain name registration agreement. The Court cannot grant or deny summary judgment as to affirmative defenses, only as to claims.

## II. Standard of Review

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Id.* at 323, 106 S.Ct. 2548. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the record presents factual issues, the court must not decide them, but rather, must deny the motion and proceed to trial. *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981).[15] *Pro se* pleadings are held to a less stringent standard than normal pleadings. *Trawinski v. United Tech.*, 313 F.3d 1295, 1297 (11th Cir.2002).

**15.** All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**16.** Plaintiff contends that over half of the Sunrise registrations were illegitimate, but that, contrary to its own rules, Defendant accepted them without verifying their legitimacy. Plaintiff also argues that Defendant created a system that would attract illegitimate registrations to increase revenue by reselling domain names and only later created the challenge of last resort for ineligible registrations.

## III. Analysis

### A. Plaintiff's Claims

#### 1. Tortious Interference

Plaintiff alleges that Defendant intentionally and unjustifiably interfered with his business relationship with his registrar, DirectNIC, and thus suffered loss as a result of being denied free use of his domain name registrations.

█ In Florida, a claim for tortious interference with a contract or business relationship requires: 1) a contract or business relationship that affords plaintiff legal rights; 2) defendant's knowledge of the contract or business relationship; 3) defendant's intentional, unjustified procurement of a breach of the contract or interference with the relationship; and 4) damages to plaintiff resulting from the breach. *International Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir.2001); *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir.1998) (citation omitted); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla.1994) (citing *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla.1985) and *Register v. Pierce*, 530 So.2d 990, 993 (Fla. 1st DCA 1988)).

█ Plaintiff has not presented any evidence to support a finding that Defendant's "interference" with the DirectNIC contract was unjustified. Although imperfect [16] and, frankly, confusing, Defendant

The Court acknowledges that Defendant's system contained serious flaws and perhaps created more problems than it solved. Indeed, any system that allows for issuance of authorization codes to registrants who thereafter could achieve the transfer of generic names before they were validly offered to the public on an equitable basis raises questions as to the system's efficacy. However, as stated above, a registry's implementation of a poorly designed, poorly run process does not give rise to a claim merely by virtue of its poor design and implementation.

had in place two processes—1) the Sunrise Period during which qualified trademark owners could seek to register domain names, and 2) an equitable allocation Land Rush process following the Sunrise Process for the general public to seek to register non-trademarked or generic domain names. The Court is unclear as to the exact parameters of these processes, but to the extent the Court can glean the procedures, it seems that, because he did not own trademarks in any of the names, Plaintiff's only course of action—even if he succeeded in challenging the names during the Sunrise Period—would have been to request cancellation of the names pursuant to Option 1, and then wait for equitable reallocation under the Land Rush Process.

Plaintiff did not follow these rules, but rather subverted the process by attempting to register domain names for his own use before the names were offered on any

basis to the general public,[17] Defendant's "interference" by locking the domain names was, as a matter of law, justified.

Plaintiff argues that, while he is bound to his contract with DirectNIC, he is not subject to any of Defendant's Sunrise-related agreements. Although WIPO never responded to Plaintiff's repeated requests for a copy of the relevant agreements, Plaintiff was still subject to them. Indeed, his registrant contract with DirectNIC incorporated the relevant agreements and rules by reference.[18] (DirectNIC Registrant Contract at ¶ 20).[19] "[W]here a writing expressly refers to and sufficiently describes another document, that other document is to be interpreted a part of the writing." *Woodard Tire Co., Inc. v. Hartley Realty Inc.*, 596 So.2d 1114, 1116 (Fla. 3d DCA 1992). DirectNIC in fact derives its sole authority to register .info domain names from its agreement with

Defendant, at oral argument, indicated that it would accept the Court's guidance as to how to conduct the equitable reallocation process in a fair, lawful manner. The Court will not set forth explicit guidance in this regard except to say that the general public, including Plaintiff, must be given the opportunity to gain the right to register a generic domain name.

17. As a December 14, 2001, "wired.com" news article, "The 411 on Dot–Info Disputes," by Joanna Glasner reflects, Plaintiff was not the only challenger who successfully "skirted the rules to ... snap up names before the others ... [by taking] part in an early registration procedure that was intended to be open only to trademark holders." (Palage Decl., Attach. 8). In the article, one Stephen Rumney "knew he didn't have trademarks for the domains, [but] he reasoned that probably no one else did, either." (*Id.*). Plaintiff is also mentioned in this article as a "man who spent upwards of $5,000 in fees to challenge a host of dot-info domains improperly registered by non-trademark holders." (*Id.*).

18. Moreover, all the information was available online to Plaintiff and the rest of the Internet public.

19. Paragraph 20 of the DirectNIC contract to which Plaintiff admits being bound sets forth the "Addendum Agreement for New gTLD's" as follows:

> You agree that in addition to the foregoing terms and conditions of service, any [second-level domain] name(s) registered by you within the ....info ... gTLD shall bind you to the terms and conditions promulgated by the domain registry [i.e., Afilias] for that particular gTLD. The terms and conditions for each domain registry can be found below[.]

The Addendum information was also filed as part of Attachment 2 to the Vinterella Declaration. This Addendum explicitly requires "you agree to comply with the requirements set forth by Afilias for domain names registered during the Sunrise Period" and "Afilias expressly reserve[s] the right to deny, cancel or transfer any SLD name registration that it deems necessary, in its discretion, to protect the integrity and stability of the registry ... Afilias also reserve[s] the right to freeze a SLD name during resolution of a dispute." (*Id.*).

Defendant,[20] and hence Defendant was simply enforcing its own rules by locking the names.[21] Defendant has no obligation to recognize any reported registration by DirectNIC that runs contrary to its rules.

Plaintiff also contends that during his registration process, Defendant never refused to process his names nor imposed on him any conditions. Plaintiff further claims that during Defendant's own process of challenging Sunrise names to assess their consistency with Sunrise requirements, Defendant never challenged him even though he confirmed to Defendant that he held no trademarks in the names. Plaintiff thus asserts that he never sought to mislead anyone and was consistent in informing both Defendant and WIPO that he did not hold trademarks. Whether Defendant knew or should have known that Plaintiff's registrations were being authorized without trademark information, and whether Plaintiff consistently informed Defendant and other entities of his lack of trademark rights, are not at issue. The point is that Plaintiff knowingly subverted the process by seeking to register names which should have been made available during the general Land Rush Period. Plaintiff was subject to the rules and regulations just as every other person seeking to register a domain name.[22] Plaintiff cannot circumvent the rules and then claim that the organization whose rules he violated unlawfully interfered with his contract with his registrar.

For these reasons, summary judgment in Defendant's favor is appropriate.

## 2. Anticybersquatting Consumer Protection Act

■ In 1999, Congress amended the Trademark Act of 1946 with the Anticybersquatting Consumer Protection Act ("ACPA"), Pub.L. No. 106–113, § 3001 *et seq.*, 113 Stat. 1501A–545.

> The purpose of the bill is to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as "cybersquatting."

S.Rep. No. 106–140, at 4 (1999). Thus, the ACPA primarily was intended to protect against cybersquatters. *Barcelona.com v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 624 (4th Cir.2003). The ACPA also provided "limited liability to registrars who infringe on a trademark in the administration of the registration, transfer, and cancellation of domain names pursuant to a 'reasonable policy' that is consistent with the purposes of the trademark laws." *Id.* at 624–25 (citing 15 U.S.C. § 1114(2)(D)(i)-(iii)). "Without such limitation of liability, all registrars would potentially have been exposed to the

---

**20.** As DirectNIC's in-house counsel confirms, "All domain names registered by ... Direct NIC are subject to [the registrant agreement that Plaintiff entered with Direct NIC]." (Vinterella Decl. at ¶ 9).

**21.** The Registry Registrar Agreement between Afilias and DirectNIC is filed as Exhibit E to Afilias' Counterclaim, Document 11.

**22.** It is of no moment that Plaintiff had authorization codes, which ostensibly gave him

the "right" to register the names before they were offered to the public. The authorization codes were themselves issued erroneously, and Defendant justifiably stepped in to correct the error by locking the domain names until they could be offered to the public on an equitable basis during the Land Rush Period.

Plaintiff's admission that he did not own trademark rights in the names is also of no import, for the names were and are generic names not subject to any trademark or service mark restrictions.

offense of cybersquatting because they register and traffic in domain names that could be infringing or diluting trademarks protected by the Lanham Act." *Hawes v. Network Solutions,* 337 F.3d 377, 384 (4th Cir.2003). Finally, the ACPA provided some protection for reverse domain name hijacking, i.e., the ACPA allows a domain name registrant to sue an overarching trademark owner who misuses or abuses his rights in bringing a cybersquatting action. *Id.,* 337 F.3d at 383 (4th Cir.2003) (citing *Barcelona.com,* 330 F.3d at 624–25). It is under this reverse domain name hijacking provision that Plaintiff seeks to sue Defendant. The provision reads:

> A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) [23] may, upon *notice to the mark owner,* file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter.

15 U.S.C. § 1114(2)(D)(i)(II)(v) (emphasis added).

Neither the *Barcelona.com* nor the *Hawes* court had occasion to inquire whether the ACPA contemplates the type of action brought by a registrant against a registry regarding use of a generic domain name. The lack of such occasion is not surprising, however, for the reverse domain name hijacking portion of the statute, by its express terms, contemplates civil actions against overarching *trademark holders.* Plaintiff here did not sue a trademark holder who disabled his names claiming to own trademark rights in them but rather a registry operator who wants to offer non-trademarked names on an equitable basis to the general public under its own procedures. The ACPA does not provide for any cause of action such as the one Plaintiff seeks to bring and thus summary judgment in Defendant's favor is appropriate.

## B. Defendant's Counterclaim Under the Computer Fraud and Abuse Act

■ Defendant seeks summary judgment on its counterclaim for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* The CFAA, a criminal statute, provides a civil remedy to "any person who suffers damage or loss by reason of a violation of this section." 18 U.S.C. § 1030(g). Defendant alleges that Plaintiff violated two parts of this section— §§ 1030(a)(4) and 1030(a)(5)(A). Section 1030(a)(4) provides a remedy if a person:

---

**23.** Clause (ii)(II) reads:

> An action referred to under clause (i)(I) is any action of refusing to register, removing from registration, transferring, temporarily disabling, or permanently canceling a domain name...
>
> (II) in the implementation of a reasonable policy by such registrar, registry, or authority prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of *another's mark.*

15 U.S.C. § 1114(2)(D)(i)(II)(ii)(II) (emphasis added). This subsection further references clause (i)(I), which Defendant cites as a safe harbor provision.

> A domain name registrar, a domain name registry, or other domain name registration authority that takes any action described under clause (ii) affecting a domain name shall not be liable for monetary relief or, except as provided in subclause (II), for injunctive relief, to any person for such action, regardless of whether the domain name is finally determined to *infringe or dilute the mark.*

15 U.S.C. § 1114(2)(D)(i)(I) (emphasis added). The Court notes that this safe harbor provision limits liability for a domain name registry such as Defendant only in trademark-related actions. Plaintiff admittedly has no trademark-related action, and hence the Court need not determine the degree of protection offered under this subsection.

knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1–year period.

Section 1030(a)(5)(A)(iii) provides a remedy if a person "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage." The statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information," 18 U.S.C. § 1030(e)(8); and "loss" as "any reasonable cost to any victim, including the cost of responding to an offense," *id.* at § 1030(e)(11).

Defendant alleges that by using the authorization codes to register domain names, Plaintiff intentionally and without authorization accessed Defendant's registry database. As a result of Plaintiff's actions, Defendant alleges, the domain names remain locked and unavailable for equitable reallocation to the general public, and Defendant has incurred approximately $100,000 in damages as a result of responding to said actions. (Palage Decl. ¶ 27).[24]

Defendant cites as support *Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238 (S.D.N.Y.2000). In that case, a registrar alleged that a competitor used a search robot to access its computers and harvest registrant information, which caused diminished server capacity and potential systems shutdowns. *Id.* at 251. Plaintiff's actions herein are not akin to the use of a search robot to harvest registrant information and did not cause the type of damage contemplated by the CFAA. Here, WIPO gave Plaintiff authorization codes to register his names, which Plaintiff did through his registrar. There is no evidence that Plaintiff directly accessed Defendant's computer system to register the domain names in question. Moreover, although it later was discovered that the codes were given to Plaintiff in error, Plaintiff cannot be held liable under the CFAA simply on the basis that he used the codes to register domain names. Plaintiff's actions may have led Defendant to lock the domain names and hence cause them to be unavailable, but this is not the sort of "impairment to the ... availability of data" contemplated by the CFAA. As the legislative history indicates, a civil cause of action was added to redress damage and loss as a result of serious computer abuses, such as transmission of viruses or destructive worms and use of fraud to access non-public information. S. Rep. 101–544 (1990) ("Misuse of computers, whether it is by a spy probing military secrets or by a destructive computer virus or worm released onto a computer network, threatens the work of all computer users."). For this reason, the Court must deny summary judgment as to the counterclaim.

## IV. Conclusion

For all the foregoing reasons,

it is therefore **ORDERED AND ADJUDGED** that Defendant's Motion (Doc. 26) is **GRANTED in part and DENIED in part.** The Motion is **GRANTED** to the extent it seeks summary judgment on Plaintiff's claims of tortious interference and a violation of the Anticybersquatting Consumer Protection Act. The Motion is **DENIED** to the extent it seeks summary

---

**24.** Palage states only that "Afilias has expended upwards of $100,000 in direct response to [Plaintiff's] actions." (Palage Decl., ¶ 27). He does not specify whether those expenses were in the form of attorneys' fees, computer-related costs, or other costs.

judgment on Defendant's Counterclaim. It is further ordered that the Defendant's Counterclaim is hereby **DISMISSED.**